## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 15-21543-Civ-TORRES

MARIA MARDONES, an individual,

      Plaintiff,

v.

THE SAMURAI, INC., a Florida
for-profit corporation, and THOMAS
BALDWIN, an individual,

      Defendants.

_____/

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on The Samurai, Inc.'s ("Samurai) and Thomas Baldwin's ("Mr. Baldwin") (collectively, "Defendants") motion for summary judgment against Maria Mardones. [D.E. 30]. Plaintiff responded on April 23, 2018 [D.E. 37] to which Defendants replied on April 30, 2018. [D.E. 40]. Therefore, Defendants' motion is now ripe for disposition. After reviewing the motion, response, reply, related authorities submitted by the parties, and the record in this case, Defendants' motion is **GRANTED in part** and **DENIED in part**.

### I. BACKGROUND

Plaintiff, a former server, alleges violations of both the Fair Labor Standards Act ("FLSA") and the Florida Minimum Wage Act ("FMWA") against her former employer, Samurai, and its CEO. Plaintiff seeks damages because she was

1

purportedly paid below the minimum wage when she was required to share her tips with non-tipped employees from April 10, 2012 through February 2017.   These employees included kitchen workers and management who should not have shared in the tip pool.

Defendants' motion seeks summary judgment against Plaintiff on all counts in Plaintiff's complaint.   Defendants argue that, contrary to Plaintiff's allegations, there is no genuine issue of material fact that Defendants did not violate the FLSA or the FMWA.   Defendants claim that Plaintiff has no record evidence – aside from her conclusory and unsupported assertions – to support her contention that she was required to participate in a tip pool prior to July 2013.   Defendants also maintain that there is no admissible evidence that non-tipped employees received any portion of Plaintiff's tips after July 2013 when a mandatory tip pool policy was established. Moreover, Defendants argue that Plaintiff has no evidence of willfulness necessary to assert a claim occurring any earlier than four years from the date Plaintiff filed her complaint.   Finally, Defendants contend that Plaintiff has failed to proffer sufficient evidence supporting her individual claims against Mr. Baldwin.   Because all of Plaintiff's claims fail as a matter of law, Defendants conclude that their motion for summary judgment must be granted.

Plaintiff responds that issues of fact exist with respect to each of the arguments raised by Defendants.   Plaintiff argues that summary judgment cannot be granted and that the matter should proceed to trial on all claims and against all defendants.

## II.   ANALYSIS

### A. _Applicable Legal Principles and Law_

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

FED. R. CIV. P. 56(c)(1).   "On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." _Matsushita Electric Indus. Co. v. Zenith Radio Corp._, 475 U.S. 574, 597 (1986) (quoting another source).

In opposing a motion for summary judgment, the nonmoving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that specific facts exist demonstrating a genuine issue for trial. _See_ FED. R. CIV. P. 56(c); _Celotex Corp. v. Catrett_, 477 U.S. 317, 323–24 (1986).   The existence of a mere "scintilla" of evidence in support of the nonmovant's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmovant. _See Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 252 (1986).   "A court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, or upon which the non-movant relies,

are 'implausible.'" *Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (citing *Matsushita*, 475 U.S. at 592–94)).

At the summary judgment stage, the Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  In making this determination, the Court must decide which issues are material.  A material fact is one that might affect the outcome of the case.  *See id.* at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## B. *Willfulness and the Relevant Statutory Period*

The statute of limitations for claims brought under the FMWA is four years. § 95.11(3)(q), Fla. Stat. However, in cases of a willful violation by the employer, a five-year statute of limitations will apply. § 95.11(2)(d), Fla. Stat. Plaintiff must provide evidence that would "establish that Defendants' conduct which allegedly violated the FLSA was willful...." *Quinones v. Alhanan, Inc.*, 2015 WL 12551066 at *2 (S.D. Fla. Apr. 17, 2015). "Willfulness" is defined as the condition where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McGlaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  The Department of Labor has defined 'reckless disregard' as an

4

"employer's failure to make adequate inquiry into whether its conduct is in compliance with the Act." 5 C.F.R. § 551.104.

Given these broad fact-based definitions, courts in our Circuit and District have often held that the issue of willfulness is a fact question and inappropriate for judgment as a matter of law. *E.g., Alvarez-Perez,* 515 F.3d at 1164, 1167-68 (jury's verdict on willfulness governed outcome of liquidated damages where fact issue existed on veracity of each of defendant's witnesses on the issue and where jury could have found that more should have been done to enforce the FLSA); *Davila v. Menendez,* 717 F.3d 1179, 1185 (11th Cir. 2013)  (reversing summary judgment on willfulness; "[d]espite [defendants'] assertions that they were ignorant of their obligations under the minimum wage laws, a reasonable jury could have drawn a contrary inference from the evidence, and the district court erred when it refused to submit the issue of willfulness to the jury."); *Morrison v. Quality Transport Svcs, Inc.*, 474 F. Supp. 2d 1303, 1313 (S.D. Fla. 2007).

Plaintiff's case for willfulness specifically relies on a lawsuit in 2001 involving a Benihana restaurant that involved similar tip pool violations, which case Plaintiff argues should have placed Samurai on notice of the problem. In *Zhao v. Benihana, Inc.*, 2001 WL 845000, at *2 (S.D.N.Y. May 7, 2001), a federal court found that the plaintiff provided sufficient evidence of a mandatory tip pool that included ineligible employees. The court reasoned that because management either instituted or adopted the tip sharing agreement as a matter of restaurant policy, the tip pool was involuntary. *Id.*  Plaintiff highlights this case as evidence that Samurai showed at

least reckless disregard of its obligations by not addressing the same situation presented by the tip pool arrangement at Plaintiff's workplace.

Defendant tries to distinguish this case because it occurred in a Benihana restaurant in New York, with no mention or indication that this was occurring in other Benihana owned restaurants, including Samurai. Defendant also maintains that "there is no evidence that Defendants were ever on notice of any issues relating to the tip pool at Samurai prior to December 2012." [D.E. 40].

Clearly the point is a debateable one. Though this case obviously involved an affiliated entity, it did arise some time ago and did not involve the same managers or supervisors. But nevertheless we agree with Plaintiff that a sufficient factual issue exists based on this history and the other evidence in the record. The Benihana case arguably should have prompted Defendant to revisit whether any tip violations were occurring in Defendant's restaurant. But even apart from that, the record here shows that there were very conflicting accounts as to how involved management was in enforcing its policies and in directing its employees. After all, Samurai maintains that prior to July 2013 there was a purely voluntary tip pool arrangement. Yet, at one point Samurai's manager was threatening discipline if employees did not follow this same "voluntary" arrangement. And, at the same time, the head chef was policing the tip pool, which seems to run afoul of the notion that this whole thing was voluntary. At least that is the result we reach if we draw all inferences in favor of plaintiff for summary judgment purposes. But that is the standard we must apply. And, were we to follow Samurai down its summary

judgment road on this very fact-laden issue, the threat of an unnecessary reversal – at great expense to the litigants and the court – would be looming over this case.

Obviously we can revisit this issue at the Rule 50 stage if the evidence presented at trial is as compelling as Samurai now suggests.  But given that we cannot draw inferences in Samurai's favor, Defendant's Rule 56 motion based on the relevant statutory period is **DENIED**. An issue of fact exists as to whether the statute of limitations should be four or five years.

In addition to the five year statute of limitations, Plaintiff may also be entitled to an additional fifteen days pursuant to Fla. Stat. § 448.110(6)(b). Thus, the relevant time period for Plaintiff's claim may run from April 10, 2012 through April 25, 2017. Defendant argues that the Plaintiff is not entitled to the additional fifteen days, because it is inconsistent with the statutory language of Fla. Stat. § 448.110(6)(b). [D.E. 40]. However, the statute provides that: "an action pursuant to this section shall be tolled during this 15 day period." Fla. Stat. § 448.110(6)(b). The statute does not state that Plaintiff is not entitled to the additional fifteen days for failing to file a claim immediately after the fifteen day tolling window. Additionally, Defendant failed to provide any case law in support of the argument that Plaintiff is not entitled to the additional fifteen days if a claim is not filed immediately after the closing of the tolling window. Thus, we elect to add the fifteen days to the five year statute of limitations that may apply. *See also Barkley v. Pizza Hut of America, Inc.*, 2015 WL 5008468, * 3 (M.D. Fla. Aug. 21, 2015) (adding an additional 471 days to the statutory period, because the statute of limitations was tolled for 471 days).

Accordingly, Defendant's motion regarding the additional fifteen days to the statutory period is also **DENIED**.

### C. *Whether the Tip Pool Prior to July 2013 was Voluntary*

Under the FLSA, the minimum wage that an employer must pay an employee is $7.25 per hour. 29 U.S.C. §206(a)(1)(c). That rule gives way, however, if the employee is a "Tipped Employee"—defined as an employee who regularly makes at least thirty dollars in tips per month. 29 U.S.C. §203(t). In that instance, §203(m) authorizes the employer to pay the employee an hourly wage of $2.13 plus an additional amount in tips that brings the total wage up to the federal minimum wage of $7.25 an hour. 29 U.S.C. §203(m). An employer is said to take a "tip credit" where the employer utilizes the employee's hourly tips to reach the minimum hourly wage. An employer may not take a tip credit, however, unless "all tips received by such employee have been retained by the employee." *Id.*

Title 29 C.F.R. § 531.54 explains that: "[W]here employees practice tip splitting, as where waiters give a portion of their tips to the busboys, both the amounts retained by the waiters and those given the busboys are considered tips of the individuals who retain them, in applying the provisions of sections [203(m)] and [203(t)]." Thus, under the FLSA and FMWA, Congress has implied that employees are free to decide what to do with their tips, as long as their decision is free from coercion or condition of employment. *See Rousell v. Brinker Int'l, Inc.*, 441 F. App'x. 222, 230 (5th Cir. 2011) (stating that Congress has not indicated that tipped employees are unable to participate in any voluntary tip pool that is free from

8

coercion by management).; *see also Kubiak v. S.W. Cowboy, Inc.*, 164 F. Supp. 3d 1344, 1355 (M.D. Fla. 2016) (stating that "a tipped employee may voluntarily choose to share tips with an otherwise ineligible employee so long as that tip-sharing is done without coercion by the employer.").

"A practice is voluntary when the employee has full control over his/her tips without any recommendations, suggestions, requirements, or implications by management or trainers." *Rousell*, 441 F. App'x. at 230. However, if the tip pool is not voluntary (i.e. mandatory) and non-tipped employees participated in the tip pool, then the tip-pooling arrangement would be invalidated and the employer would not be able to claim the tip-credit. *See Myers v. Cooper Cellar Corp.*, 192 F.3d 546, 549-50 (6th Cir. 1999) (stating that if a non-tipped employee participates in a non-voluntary tip-pool, the tip-pool will be invalidated).

The question addressed in this section of the analysis is whether the tips prior to July 2013 were retained by the employees.  Prior to July 2013, Samurai's Employee Handbook stated: "while employees are entitled to engage in pooling, distributing, or redistributing or sharing practices on a voluntary basis, they are not required to do so." [D.E. 30]. However, on July 2013, "Samurai implemented a Mandatory Tip Pool Policy where only Servers, Teppan Chefs, Sushi Chefs, Bussers, Bartenders and Food Runners were permitted to participate." *Id.* Samurai's revised employee handbook emphasized that employees who do not regularly and customarily provide direct services to customers are ineligible to participate in the tip pool. *Id.* Nonetheless, Plaintiff alleges that the tip pool was always mandatory

9

and ineligible employees such as kitchen helpers, sushi helpers, and "Salad Momma" always participated in the tip pool. [D.E. 37].

Defendant contends that the tip pool prior to July 2013 was in fact voluntary, because "management never told servers that they must participate in the tip pool, and managers played no role in the collection or distribution of the tips." [D.E. 40]. Additionally, Defendant cited the employee handbook in effect prior to July 2013, which stated that employees are permitted to engage in a voluntary tip pooling arrangement but they are not required to do so. [D.E. 30]. Defendant concludes that summary judgment should follow on this significant aspect of the case.

In support of the claim that the tip pool prior to July 2013 was voluntary, Defendant cites evidence that Mr. Lozada never instructed managers to discipline employees for not participating in the tip pool. For example, Defendant claims that employee Francine Aponte (Ms. Aponte) testified that she was never disciplined for refusing to share tips. *Id.* Defendant also argues that management had no involvement in the tip pool and no one testified otherwise. *Id.* Plaintiff even stated in her deposition that the tip out money was given to the head sushi chef, and not a manager. [D.E. 32-1].

In response, Plaintiff argues that the tip pool should be considered voluntary because there was no evidence of employees voting for the tip pool arrangement. [D.E. 37]. Yet that may not matter. In *Kubiak*, or instance, Judge Howard declined "to accept Plaintiffs' contention that the Kitchen Tip Pool is invalid because the servers did not have a specific agreement with the kitchen employees as to how,

when, to whom, or on what basis the proceeds of the pool would be distributed." *Kubiak*, 164 F. Supp. 3d at 1363. Indeed Judge Howard could find no prior case where a court held that a voluntary tip pool must satisfy the "mutual agreement" requirement. *Id.* at 1364. Neither have we; an employee plebiscite is not mandated under the FLSA in order for a court to recognize a truly voluntary tip pool arrangement.

More persuasively, however, Plaintiff also points our attention to two disciplinary warnings posted by management. The first disciplinary warning was on the bulletin board in the restaurant on April 10, 2012 that fell within the relevant time period. [D.E. 32-7]. This disciplinary warning stated that "those who continue to short the Chefs on a consistent basis on cash tips will begin to be disciplined accordingly." [D.E. 32-7]. In regard to the warning, Mr. Lozada admitted in his sworn testimony that this warning constituted a "violation under the voluntary tip pool." [D.E. 32-4].

Similarly, the second disciplinary warning stated that servers are not declaring/sharing the usual average of fifteen percent gratuity, and are thus subject to a "written warning" that may lead to discharge. [D.E. 32-17]. So based on this record, Plaintiff contends that these warnings could demonstrate to the jury that this coercive action by management evidenced a mandatory tip pool. *Compare Kubiak*, 164 F. Supp. 3d at 1355-57 (stating that a tip pool is considered mandatory if the evidence demonstrates that management engaged in coercive practices or expressly told the employees that the tip pool was mandatory), with *Rousell*, 441 F.

App'x. at 230 ("[a] practice is voluntary when the employee has full control over his/her tips without any recommendations, suggestions, requirements, or implications by management or trainers.").

In response Defendant addresses the first disciplinary warning through the classic "never mind" defense. Defendant points out the manager throughout most of Plaintiff's employment, Mr. Lozada, did not author or post the first memo. It was instead written by a previous errant manager. When he took over, Mr. Lozada promptly took the memo down on April 10, 2012. [D.E. 30].

Additionally, Defendant highlights a different written memo from the Regional Manager that explained that "[Mr. Lozada] current GM removed the memo from the bulletin board on April 10 when he noticed the memo on second day he was transferred and started to work for Samurai." [37-3]. The Regional Manager indicated that all five managers of Samurai stated that "no disciplinary action were issued to any employee for tip distribution issues." *Id.*

Defendant also counters by focusing on co-employee Aponte's deposition. In her deposition, Ms. Aponte testified that, whenever the Chefs would complain to her about not tipping out enough money, she would respond by telling them: "[g]o to the manager. This is not mandatory. This is illegal what you guys are doing." [D.E. 32-5, p. 18]. Ms. Aponte also stated that "management could not do anything." [D.E. 32-5, p.18]. And, when asked whether she was aware of management reprimanding anyone for failing to tip out to the chefs, Ms. Aponte responded: "no." [D.E. 32-5].

Based on this record evidence, Defendant concludes that the disciplinary warnings cited by Plaintiff are legally inconsequential and no reasonable juror could find otherwise. *See White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 387 (E.D. Mo. 2014) (though not dispositive, the lack of any discipline for failure to participate in any tips-sharing arrangement provides some support that such participation was voluntary). Defendant contends that the record shows no evidence of a coercive practice because no employee was reprimanded for not participating in the tip pool, and because employees were repeatedly made aware that the tip pool was not mandatory. [D.E. 30].

Drawing all inferences in Defendant's favor, Defendant may have a persuasive case. But for summary judgment purposes we find that "whether tip-pooling was voluntary is an issue of fact for a jury to determine." *White*, 301 F.R.D. at 387. Defendant's persuasive defenses notwithstanding, our review of the record shows that a reasonable juror could conclude otherwise.

If, for instance, the jury credited Plaintiff's testimony, they could place great weight on her testimony as to how she learned of this voluntary tip-out practice:

> "[T]he same waiters—servers that trained you had a piece of paper. In there they had written down the percentage that you had to give to the sushi chef, to the kitchen helper, the one in the back, to the bartender, also to the busboy, and also they have for the lady of the salads."

[D.E. 32-1]. This version of events is corroborated by Ms. Aponte who verified in her deposition that servers and chefs would explain the "tip-out" procedure, after management instructed the new servers to follow the directions of the different

13

servers. [D.E. 32-5]. Thus, a reasonable jury could conclude that, by relinquishing material control over server training, the company ran a risk that what began as a voluntary practice would evolve into a rule that new servers would consider mandatory. *E.g.*, *Kubiak v. S.W. Cowboy, Inc.*, 2016 WL 5933388 (M.D. Fla. Oct. 12, 2016) (denying defendant's motion for new trial following jury verdict finding tip pool was mandatory; "The jury could have concluded that Plaintiffs reasonably accepted the accuracy of the information they received from senior servers during training because . . . the servers were solely responsible for training other servers. The jury was entitled to infer from all of the evidence that the owners and managers allowed a pervasive environment of pressure to develop and failed to intervene.").

We are duty bound to draw all reasonable inferences in Plaintiff's favor for summary judgment purposes. To discount the first manager's warning memo because it was quickly removed, for instance, would be tantamount to drawing inferences in Defendant's favor. That would also be the case if we credited the Regional Manager's explanation as to why the tip pool remained voluntary thereafter. Equally so, we could be taken to the task if we found that a voluntary tip pool arrangement was in place despite the history of server-on-server training and the practice of one of the beneficiaries of that arrangement, the head sushi chef, distributing the tips at night at the register. Again, Defendant discounts that evidence but we must credit it under Rule 59.

Therefore, we find that Plaintiff has provided enough evidence to establish a genuine issue of fact on this threshold issue. Defendant's motion is **DENIED** on this basis.  The jury will have to decide whether the tip pool arrangement from April 10, 2012 through July 8, 2013 was truly voluntary or not.

### D. *Whether Non-Tipped Employees Participated In The Tip Pool*

Plaintiff contends that the record shows that non-tipped employees including the general manager, Mr. Lozada, participated in the tip pool in violation of the FLSA. [D.E. 37].  This question goes to both the purported "voluntary" tip pool period prior to July 2013, as well as the admittedly mandatory pooling arrangement that began on July 8, 2013.

The FLSA defines a tipped employee as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t). The FLSA and FMWA permit tip pooling, but the tip pooling arrangement will be deemed invalid if ineligible employees participate in the mandatory tip pool. *See, e.g., Myers v. Cooper Cellar Corp.*, 192 F.3d 546, 550 (6th Cir. 1999) (agreeing with the lower court's determination, which found that salad mixers were non-tipped employees because they had limited customer interaction, such that the tip pool was invalidated).; *Rubio v. Fuji Sushi & Teppani, Inc.*, 2013 WL 230216, at * 2 (M.D. Fla. Jan. 22, 2013) (holding that when non-tipped employees, such as kitchen chefs with no customer interaction, participate in a mandatory tip pool, the tip pool is invalidated).; *Pedigo v. Austin Rumba, Inc.*, 722

F. Supp. 2d 714, 735 (W.D. Tex. 2010) (finding that preparation cooks invalidated the tip pool because they engaged in minimal customer interaction).

### 1. *Mr. Lozada's Loan*

Beginning with Mr. Lozada, Plaintiff claims that Mr. Lozada "took money from her at work, on the floor of Samurai restaurant, in cash, and during her scheduled shift." [D.E. 37]. Additionally, Plaintiff points to Cintado's deposition, where she concedes participation in the tip pool by management constitutes a violation. She would have terminated Mr. Lozada if she would have known that he was taking Plaintiff's tip money. [D.E. 32-2]. Plaintiff argues that the "practice of forced sharing of tips with management is an illegal practice, regardless whether the members of management are also engaged in services that could be the subject of tipping." *Wajcman v. Invest. Corp. of Palm Beach*, 2008 WL 783741, at *3, n.1 (S.D. Fla. Mar. 20, 2008); *see also Ayers v. 127 Restaurant Corp.*, 12 F. Supp. 2d 305 (S.D.N.Y. 1998) (indicating that a general manager of a restaurant is not someone who customarily and regularly receives tips under the FLSA).

Defendant argues that payments made to Mr. Lozada were in fact a loan, and not a forced sharing of tips with management. [D.E. 40]. Defendant contends that Plaintiff has always referred to this transaction as a loan, as demonstrated by the fact that she maintained personal records labeled "prestamo" (which means loan in Spanish), to track both the amounts loaned and the payments received. *Id*. In addition, Plaintiff referred to the transaction as a loan multiple times during her

deposition. *Id.* For example, when questioned whether the loan was for Mr. Lozada's moving expenses, Plaintiff responded: "I loaned him for several things." [D.E. 32-1].

It is true that, for instance, the tip pool in *Ayers* violated the FLSA because the employees did not retain all of their gratuities due to the fact that the manager participated in the tip pool. *Ayers*, 12 F. Supp. 2d at 308. By contrast, Mr. Lozada had no participation in the tip pool. In his deposition, Mr. Lozada indicated that he only received the money because Plaintiff offered to help him; Mr. Lozada was not involved in the tip pool, nor did any other employee give money to Mr. Lozada. [D.E. 32-4]. In addition, no showing has been made of any coercion on the part of Mr. Lozada. While Plaintiff initially stated that she felt pressured to loan Mr. Lozada money because he was her boss, Plaintiff later contradicted that statement by indicating that it made her feel good to help Mr. Lozada, and that she was the type of person that would help someone whenever she could. *Id.* Plaintiff is thus conceding that this payment was a loan.

Also, Plaintiff has failed to provide any evidence that demonstrates that the money given to Mr. Lozada was money earned from tips that same day. In her deposition, Plaintiff states that she could have written a check to Mr. Lozada, however, he would always tell her to bring the money the next day in cash. [D.E. 32-1]. This indicates that Mr. Lozada would notify the Plaintiff a day in advance as to when the money was needed, and Plaintiff would bring the money the following day. Plaintiff argues that this was tip money; however, this money was likely already retained by the Plaintiff. Thus, "what she chose to do with her money after she

received it is her prerogative and has no bearing on the tip pool." *Kubiak*, 164 F. Supp. at 1355.

Black letter FLSA law prohibits the forced sharing of tips with management. 29 U.S.C. § 203.  But, because Plaintiff failed to demonstrate that management forced her to share her tips with management or that management participated in the tip pool, we agree with Defendant's argument. Thus, Defendant's motion regarding Plaintiff's admitted loan to Mr. Lozada is **GRANTED**. Plaintiff's loan to Mr. Lozada did not invalidate the tip pool arrangement and no reasonable juror could conclude otherwise.

### 2.  *Tips Received by "Salad Momma"*

Plaintiff argues that all servers "were required to share their tips with the salad maker, Sussku Leyla ("Salad Momma")." [D.E. 37]. Plaintiff also claims that the money was given to Salad Momma directly, and that Salad Momma would remind employees to tip her if they forgot. [D.E. 32-1]. Additionally, Plaintiff points out that Salad Momma would receive approximately three to five dollars at the end of every shift. *Id*. This purportedly violates the Rule that non-tipped employees (such as a dishwasher or back of the house kitchen personnel) are prohibited from participating in a mandatory tip pool. *See Saldana v. Bird Road Car Wash, Inc.*, 2016 WL 5661632, at *4 (S.D. Fla. Sept. 30, 2016).

It is undisputed that Salad Momma is not a tipped employee, because she worked in the back of the house and had no contact or interaction with the customers. [D.E. 32-6].  Nevertheless Defendant rejects the claim by pointing again

to Ms. Aponte's deposition, where she indicates that she had no issue tipping Salad Momma because she helped out the servers. [D.E. 32-5]. Defendant also argues that Salad Momma was never listed as a participant in the Mandatory Tip Pooling Policy. [D.E. 37]. Aponte states in her deposition that she was unaware of any server that had been disciplined for not tipping Salad Momma, primarily because management did not want to get involved with the tip out procedure. [D.E. 32-5]. Defendant thus concludes that the tips given to Salad Momma were voluntary.

But Defendant's argument ignores the record evidence that Salad Momma would remind servers to pay her if she did not receive tips from them. Plaintiff indicated that she would forget to pay Salad Momma sometimes, and this would prompt Salad Momma to approach Plaintiff and tell her: "Oh, Momma Maria, you forgot yesterday that you did not give me." [D.E. 32-1]. Ms. Aponte also indicated in her deposition that she once forgot to tip Salad Momma, which caused Salad Momma to confront Aponte and demand payment. [D.E. 32-5]. The fact that Salad Momma would demand payment calls into question whether or not the tips given to Salad Momma were actually voluntary and whether  management was aware of that problem. A jury question exists on this issue.

In addition, Plaintiff relies on the fact that servers training the new employees had a paper that contained the percentages of the tips that every person must receive, and Salad Momma was included in that list. [D.E. 32-1]. Plaintiff added that management required experienced servers to train new servers. [D.E. 32-1]. Aponte confirmed Plaintiff's statement that management told experienced

servers to train the new servers. [D.E. 32-5]. This also calls into question whether or not the tips given to Salad Momma were in fact voluntary. Because a reasonable jury could conclude that by relinquishing all control over server training, the company ran a risk that what began as a voluntary practice, would evolve into a de facto rule which new servers would be reluctant to question. *Kubiak v. S.W. Cowboy, Inc.*, 2016 WL 5933388, at * 5 (M.D. Fla. Oct. 12, 2016). This can also be true with respect to Salad Momma's tips, in particular.

Therefore, the motion on this issue must be **DENIED**, because a reasonable jury could conclude that the tips made to Salad Momma were mandatory.

### 3. *Tips Received by Other Kitchen Personnel*

Plaintiff argues that tips shared with other kitchen personnel also constituted a violation. [D.E. 37]. In her deposition, Plaintiff claims that servers who trained new employees had a piece of paper which listed the tip percentage that must be given to the sushi chef, the kitchen helpers, the bartender, and also the busboy. [D.E. 32-1]. And, relying on Sushi Chef Anousith Sananikoke's testimony, Plaintiff argues that management knew and condoned the sushi chefs sharing of their tips with the back-of-the-house sushi helpers virtually every night. [D.E. 32-3].

Defendant also relies on Mr. Sananikone's deposition but concludes from it that no trial issue exists. In his deposition, Mr. Sananikone testified that the sushi chefs would agree to give the kitchen or sushi helper's tips based on their performance during that shift. [D.E. 32-3]. Additionally, Mr. Sananikone indicated

that the chefs would give the helpers tips as a token of appreciation for their work. *Id.* However, the chefs would not give the helpers tips if they slacked off. *Id.* The sushi chefs all voted and unanimously agreed to tip as a group. *Id.* Mr. Sananikone also mentioned in his deposition that sushi chefs would pay the helpers from the money received from the tip pool. *Id.*

Defendant especially relies on Plaintiff's admission in her deposition that she never handed the money directly to the sushi or kitchen helpers. [D.E. 32-1]. Plaintiff indeed concedes that she never witnessed management distribute money to the helpers. *Id.* Plaintiff merely claims that the servers were trained with a paper that identified the percentages that sushi chefs as well as sushi helpers had to receive. From this she concludes that a violation resulted.

Yet Defendant concludes that Plaintiff failed to create a genuine issue of fact due to her lack of personal knowledge that management included kitchen or sushi helpers in the tip pool. [D.E. 30]. Defendant also contends that the tip credit is not invalidated simply because the sushi chefs voted to voluntarily give money to the kitchen or sushi helpers. *Id.* Again, a tipped employee may voluntarily choose to share tips with non-tipped employees, so long as this decision was free from coercion by the employer. *Kubiak*, 164 F. Supp. at 1355.

On this point, Plaintiff did not present any compelling authority that the undisputed facts in this record could give rise to liability for improperly sharing tips with kitchen staff. Plaintiff never testified that her tips were ever shared with these workers; only that indirectly they were because the sushi chefs chose to do so.

But no violation results unless Plaintiff's own tips were reduced as a result. Significantly, Plaintiff is not alleging that the sharing of tips with the sushi chefs themselves violated the FLSA. Had she done so (and assuming that sushi chefs are ineligible tip employees) then perhaps a genuine issue could exist on this point. Similarly, if the sushi chefs were complaining about being "forced" to share their tips with the sushi helpers then perhaps a viable claim could be presented. But that is not what we have here.

The bottom line that is presented in our record is that Plaintiff concedes that the sushi chefs unanimously agreed to share *their* tips with the sushi helpers but that she did *not* share her tips with those same helpers. Nor does she testify from personal knowledge that the tip pool distributed by management ever included the sushi helpers. And even if the chef's actions violated company policy, a violation of a company's internal policy does not instantly give rise to a cause of action under the FLSA. *Coffen v. Washington Convention & Sports Authority*, 271 F. Supp. 3d 211, 213-14 (D.D.C. 2017) (stating that a violation of company policy does not itself give rise to a cause of action under the FLSA). Plaintiff has no standing to claim otherwise (unlike the sushi chefs themselves) given that her own tips were not affected.

Finally, in her response, Plaintiff suggested that manager Lozada conceded that sushi helpers were included in the company's mandatory tip pool. But when we reviewed that same testimony, we reached the opposite conclusion. Mr. Lozada testified repeatedly that the tip pool only included the sushi chefs themselves.

What they chose to do with their tips was left to them.  And that testimony is consistent with the Plaintiff's own testimony.

We thus fail to see how we can present this issue to the jury given Plaintiff's concessions and the undisputed facts in this record.  Defendant's motion regarding tips given to sushi helpers is **GRANTED**.

### E. _Whether Mr. Baldwin is an Employer under the FLSA_

In Counts I and II, Plaintiff alleges that Mr. Baldwin is individually liable under the FLSA because he failed to pay (1) minimum wage, and (2) overtime compensation.  Mr. Baldwin "cannot be held individually liable for violating the overtime provision of the FLSA unless he is an 'employer' within the meaning of the Act." _Alvarez Perez v. Sanford–Orlando Kennel Club, Inc.,_ 515 F.3d 1150, 1160 (11th Cir. 2008). The FLSA "broadly defines an employer as 'any person acting directly or indirectly in the interest of an employer in relation to an employee.'" _Id._ (quoting 29 U.S.C. § 203(d)).  "Whether an individual falls within this definition 'does not depend on technical or isolated factors but rather on the circumstances of the whole activity.'" _Id._ (quoting _Hodgson v. Griffin & Brand of McAllen, Inc.,_ 471 F.2d 235, 237 (5th Cir. 1973)) (further internal quotation and citation omitted).

The Eleventh Circuit has "recognized that '[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages.'"  _Id._ (quoting _Patel v. Wargo,_ 803 F.2d 632, 637–38 (11th Cir. 1986)).  "[I]n order to qualify as an employer for this purpose,

an officer 'must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee.'" *Id.* (quoting *Patel,* 803 F.2d at 638).   "[A] supervisor's title does not in itself establish or preclude his or her liability under the FLSA . . . ." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1310 (11th Cir. 2013).  Instead, "[t]here must be control over 'significant aspects of [the company's] day-to-day functions, including compensation of employees or other matters in relation to an employee." *Alvarez Perez*, 515 F.3d at 1160 (quoting *Patel*, 803 F.2d at 638).  In other words, "while control need not be continuous, it must be both substantial and related to the company's FLSA obligations." *Lamonica*, 711 F.3d at 1314.

Neither party disputes the fact that Samurai wholly owns Rudy's Restaurant Group and that Mr. Baldwin is the CEO of the parent corporation, Benihana, Inc. (Benihana). Yet, Plaintiff argues that there is an issue of material fact because Defendants' vice-president of human resources, Sandra Cintado (Cintado), testified under oath that she reported to Mr. Baldwin on employee-related matters or an investigation.  [D.E. 32-2].

Additionally, Plaintiff claims that Mr. Baldwin's LinkedIn provides ample evidence that Mr. Baldwin was involved in employee related matters.  [D.E. 37]. Plaintiff attaches two images of Mr. Baldwin's LinkedIn profile.  The first image shows a posting which was "liked" by Mr. Baldwin.  [D.E. 37-7].  The posting was an advertisement which stated: "We are hiring all positions for our New Restaurant Opening in Boca Raton, FL area. Invite your friends to apply on-line!" *Id.* The

second image shows the biography section on Mr. Baldwin's LinkedIn. [D.E. 37-8]. Plaintiff directs our attention to a line in the second paragraph which states: "Tom is fully committed to superior people focused cultures and brands, unparalleled guest experiences, ... ." *Id.* Plaintiff claims that Mr. Baldwin's commitment to providing excellent customer service is proof that he is sufficiently involved in employee related matters, thus qualifying him as an employer under the FLSA and FMWA. [D.E. 37].

We find just the opposite. In *Patel*, the Court ruled that the President, director, and Principal stockholder, was not an employer under §203(d) because "[he] did not have operational control of significant aspects in Pine Wood's day-to-day functions, including compensation of employees or other matters 'in relation to an employee.'" *Patel*, 803 F.2d at 638. This case is similar to *Patel* because, in his sworn testimony, Mr. Baldwin stated: "I do not have any involvement in setting work schedules, rates of pay, duties, or payment methods for restaurant employees, including Samurai." [D.E. 32-8]. Additionally, Mr. Baldwin stated: "I do not oversee the daily operations of Samurai, and play no role in the hiring and firing decisions at the local restaurant level." *Id.* The record evidence squarely supports Defendant's motion.

The same result is plainly indicated by looking at Cintado's deposition. Plaintiff relies on Cintado revealing in her deposition that she reported to Mr. Baldwin about employee-related matters and investigations. [D.E. 32-2]. Plaintiff's argument however, is belied by her own evidence. Cintado stated in her deposition

that she reported to Mr. Baldwin about employee-related matters, and investigations, but only if the situation was severe enough. *Id.* Cintado then added that she normally discussed these matters with the general counsel. *Id.* Cintado also stated that her reasoning for reporting to Mr. Baldwin was to simply "give him a heads up". *Id.* Cintado did not testify that Mr. Baldwin made any decisions or recommendations regarding any employee related matters or investigations.

Equally unpersuasive is Plaintiff's argument that Mr. Baldwin's LinkedIn profile provides evidence that creates a material issue of fact regarding his status as an employer. [D.E. 37]. Plaintiff contends that Mr. Baldwin was involved in employee hiring because he "liked" a post advertising job openings in a Samurai restaurant in Boca Raton, FL.   [D.E. 32-7]. In addition, Plaintiff claims that, because Mr. Baldwin stated in his profile that he was committed to "unparalleled guest experiences" [D.E. 37-8], he must therefore be involved in employee hiring and employee related matters. [D.E. 37].

We conclude otherwise as a matter of law. Simply because Mr. Baldwin stated that he is committed to providing "unparalleled guest experiences" [D.E. 37-8], or "liked" a post regarding job openings at a Samurai restaurant, does not provide sufficient bases to find that Mr. Baldwin had "control" over employee-related matters. Cases where control was deemed a triable issue were far different and more persuasive. For example, in *Olivas v. A Little Havanna Check Cash, Inc.*, 324 F. App'x. 839, 845 (11th Cir. 2009), a corporate officer was found to constitute an employer, because that corporate officer instructed, answered questions, and

26

resolved any issues pertaining to the employees whenever the co-owner was out of town. *See also Lamonica*, 711 F.3d at 1314 (holding that two corporate officers exercised control over the employees, because the corporate officers informed the employees that the company would no longer be able to pay them due to the company's financial struggles). In this case, Mr. Baldwin did not instruct, answer questions, resolve any issues pertaining to employees, or have any direct contact with the employees.

As a result this case is far more like the individual employer sued in *Alvarez-Perez*.  There Eleventh Circuit squarely held that even when a defendant "could have played a greater role in the day-to-day operations of the [  ] facility if he had desired, . . . unexercised authority is insufficient to establish liability as an employer." *Alvarez-Perez,* 515 F.3d at 1161.  The court affirmed entry of judgment as a matter of law in favor of a kennel club's corporate officer because he could not be an "employer," in part because – though he might have had the authority to do so – he "had not taken part in the day-to-day operations of the facility, had not been involved in the supervision or hiring and firing of employees, and had not determined their compensation." *Id.*

All the evidence that Plaintiff has mustered here does nothing more than that.  As CEO of the parent corporation, Mr. Baldwin clearly had ultimate power to affect the operations of his subsidiary's worksites and employees.  But the record shows that it was never exercised in a manner that gave rise to any potential individual liability.  It only shows that he "liked" the employees his subsidiaries

were hiring.   That is hardly surprising.   What would be surprising is if such miniscule activity by a corporate CEO in his New York office generated individual FLSA liability in a case involving how a tip-pool arrangement was managed in Kendall, Florida.

Because the FLSA clearly requires something materially more than that, Defendant's motion regarding Mr. Baldwin's status as an employer is **GRANTED**. No reasonable juror could find that Mr. Baldwin exercised control over the day-to-day operations, or employee-related matters, at this Samurai location.   Judgment shall be entered in his favor at the conclusion of the action.

### III.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendant's motion is **GRANTED in part** and **DENIED in part** as follows:

1.     A genuine issue of fact exists regarding the relevant statutory period that applies in this case and the issue of willfulness.

2     A genuine issue of fact exists regarding whether the tip pool was voluntary prior to July 2013.

3.     Mr. Lozada's loan to Plaintiff did not violate the tip pool arrangement, and did not invalidate the tip-credit as a matter of law. No evidence related to this theory of liability will be admissible.

4.     A genuine issue of fact exists regarding whether the tips given to Salad Momma violated the tip pool arrangement, and thereby invalidated the tip-credit.

5.      No genuine issue of fact exists regarding whether the tips given to the sushi helpers violated the tip pool arrangement and invalidated the tip-credit.  No evidence related to this theory of liability will be admissible.

6.      Defendant Baldwin is not an individual employer as a matter of law. Judgment shall be entered in this Defendant's favor at the conclusion of the action.

7.      The case shall proceed to trial in accordance with this Order as scheduled on September 24, 2018.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 17th day of July, 2018.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge